UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                    :

LAZSLO FRIEDMAN,               :

                  Plaintiff  :

         - against -       :

MICHAEL J. ASTRUE,        :
Commissioner of
Social Security               :
                 Defendant.  :
                                      :
----------------------------------------X

**USDS SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** 8/19/08

**MEMORANDUM and ORDER**

07 Civ. 3651 (NRB)

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Plaintiff Lazslo Friedman brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security ("Commissioner") to deny his application for disability insurance benefits.  The Commissioner filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons stated below, the Commissioner's motion is granted.

## BACKGROUND[1]

### I.  Procedural History

On June 23, 1999, plaintiff filed an application for Social Security Disability Insurance ("SSDI") benefits in which he al-

---

[1] The following facts are drawn from the administrative record ("Tr.") filed with Defendant's answer as required by 42 U.S.C. § 405(g).

leged disability due to "low back pain and leg pain" caused by a work-related accident.[2]  (Tr. 73-82, 124, 136.)  The application was denied on initial consideration and twice upon reconsideration.  (Tr. 33-34, 36-38, 40-42.)  Plaintiff then requested a hearing before an administrative law judge ("ALJ") (Tr. 43-48), which was held January 5, 2001 before ALJ Dennis G. Katz (Tr. 158-201, 418-70).  On April 19, 2001, the ALJ issued a decision concluding plaintiff was not disabled before September 30, 1996, the date he was last insured for SSDI benefits.  (Tr. 20-31.) While the ALJ found plaintiff had two medically determinable "severe impairments" -- namely a back and neck impairment (Tr. 25) -- and was unable to perform his past relevant work as an electrician (Tr. 28), plaintiff was nonetheless deemed capable of performing other substantial gainful activity in the national economy and thus was not disabled (Tr. 29).  This became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on September 20, 2001.  (Tr. 8-9, 15-16, 242-43, 248-49.)  Plaintiff thereupon filed a civil action in this district challenging this decision.  On February 15, 2005, the Court (Brieant, J.) remanded the cause for rehearing and a new decision.  (Tr. 228-29.)  A second hearing was held before the ALJ on May 24, 2006 (Tr. 386-417) and was con-

---

[2] It appears from the record that plaintiff's original SSDI application was lost.  (Tr. 69, 71-72.)  The replacement application ap-

tinued on June 15, 2006 (Tr. 471-514).  The ALJ issued a second decision on June 26 that concluded that plaintiff was not disabled before September 30, 1996.  (Tr. 211-26.)  In his second decision, the ALJ again determined that while plaintiff had a medically determinable "severe impairment" -- which the ALJ called a back impairment (Tr. 217) -- and was unable to perform his past relevant work as an electrician (Tr. 224), plaintiff was nonetheless capable of performing other substantial gainful activity in the national economy (Tr. 224-25).  This became the Commissioner's final decision when the Appeals Council again denied review in March 2007 (Tr. 202-04).  This action followed.

## II.  Facts

Plaintiff, a United States citizen and resident of Monsey, New York was forty-seven years old when his insured status expired on September 30, 1996.  (Tr. 33.)  Plaintiff, who claims he was disabled since 1991, filed his SSDI application in 1999. The record includes medical evidence from 1991, the alleged onset date, until 2005, shortly before the second administrative hearing and nine years after plaintiff's insurance status expired.  This evidence reveals a documented history of spinal impairments including degenerated intervertebral discs, disc herniation and possible nerve root compression.  (Tr. 91, 93-94,

---

pears in the administrative transcript at 73-82.

3

98-101, 109-10, 112-32, 134, 137-39, 154.)   These impairments
have produced a variety of reported symptoms including back and
leg pain (Tr. 91, 93, 98, 110, 113, 117, 124-27, 137-38, 154),
numbness, and impaired sensory, motor and reflex function (Tr.
91, 93-97, 110, 113, 117, 137).

We first review the medical evidence in the record and then
turn to the non-medical evidence that was presented to the ALJ
at the second hearing.

**A. Non-Medical Evidence**

Plaintiff is a high school graduate who completed a voca-
tional apprenticeship before working for New York City as an
electrician between 1974 and 1987, leaving after he reportedly
could no longer perform his duties.   (Tr. 74-75, 80, 168-69.)
According to plaintiff, these responsibilities entailed
"bend[ing] and crawl[ing] into to small places to do wiring and
electrical hookups" and required lifting up to twenty pounds.
(Tr. 75.)   Plaintiff also testified that he performed consultant
work after leaving his job in 1987, but stopped in 1991 because
"I don't know from minute to minute, from day to day, how I
feel. . . .  I just couldn't do it."   (Tr. 168-69.)

Plaintiff informed the ALJ that between 1991 and 1996, when
his insured status expired, he lived with his wife and two young
children.   (Tr. 104, 170.)   Plaintiff claimed to have difficulty
sitting for more than forty-five minutes (Tr. 175) and could

4

lift a fifteen-pound object only every few hours. (Tr. 416.)
At the first administrative hearing, plaintiff described his
daily activities prior to 1997 as including "some house-
hold . . . chores," including grocery shopping, running local
errands by car, and caring for his two young children as a
"househusband."[3] (Tr. 171-73.) Plaintiff also testified that he
performs light house repair work and uses a riding tractor to
cut his lawn in small sections. (Tr. 177.)

### B. Medical Evidence

Most of the medical evidence in the record was provided by
Dr. Ronny Hyman, plaintiff's chiropractor since 1991. (See Tr.
90, 124-43.) In a Workers' Compensation report based upon un-
dated computed tomography ("CT") scans and his February 1991
physical examination of plaintiff, Dr. Hyman diagnosed spinal
curvature and L4-L5 and L5-S1 disc displacements,[4] noted "patient
has a lot of discomfort" and prescribed a course of treatment
including chiropractic spinal manipulation, flexion distraction,

---

[3] At the second administrative hearing, plaintiff disputed this
characterization, adding that his children were in fact cared for by a
full-time babysitter while his wife was at work and that he had misun-
derstood the term "househusband" at the first hearing. (See Tr. 511-
13.)

[4] A normal human vertebral column consists of thirty-three verte-
brae labeled according to their position and region (in descending or-
der, cervical ("C1" through "C7"), thoracic ("T1" through "T12"), lum-
bar ("L1" through "L5"), sacral ("S1" through "S5") and coccygeal
("Co1" through "Co4")). The fifth lumbar vertebra, for example, is
labeled "L5." The space between the fifth lumbar and first sacral

hot packs and electrical stimulation.  (Tr. 125.)  Where the re-
port form asked whether the patient was disabled, however, Hyman
checked "no."  (Tr. 125.)  His subsequent reports in April and
May 1991 listed the same diagnoses, prescribed the same course
of treatment, and continued to opine that plaintiff was not dis-
abled.  (Tr. 126-27.)  On a July 1992 health insurance claim
form, Dr. Hyman made an additional diagnosis of lumbar nerve
root compression but did not give an opinion as to whether
Friedman was disabled.  (Tr. 128.)

    Dr. Hyman did not conclude plaintiff was disabled until
1993.  During four exams between February 1993 and March 1995,
Dr. Hyman continued to diagnose lumbar nerve root compression.[5]
In the first three of these exams (February 1993, 1994 and
1995), the doctor assessed plaintiff as "totally disabled."
(Tr. 129-31.)  However, at the fourth exam in March 1995, the
Dr. Hyman's assessment was only partial disability.  (Tr. 132.)
Billing forms submitted by Dr. Hyman to the New York Workers'
Compensation Board in 1996 and 1997 indicated the same diagnoses
and the same assessment of partial disability.  (Tr. 133-34.)

---

vertebrae, for example, is labeled "L5-S1."  See Dorland's Illustrated
Medical Dictionary 2079 (31st ed. 2007).

    [5] The billing form dated February 1996 (Tr. 133) indicates diag-
nosis code 739.10, which is non-existent.  Because all other forms
submitted by Dr. Hyman indicate diagnosis code 737.10, corresponding
to spinal curvature (see Tr. 125-32, 134), this appears to be clerical
error.

In March 1999, more than two years after plaintiff's in-
sured status had expired, Dr. Hyman completed a detailed ques-
tionnaire in connection with plaintiff's application for SSDI
benefits.  He noted lumbar intervertebral disc disorder, neuri-
tis and radiculitis causing back pain, leg pain, weakness, numb-
ness, muscle spasm and cramping.  (Tr. 137.)  Specifically, Dr.
Hyman assessed "L4-L5 and L5-S1 disc herniations with epidural
fat impression and thecal sac compression."  (Tr. 139.)  Treat-
ment included a significant quantity of Motrin (ibuprofen) three
to four times each day and a variety of chiropractic procedures
several times each week.[6]  (Tr. 136.)  Dr. Hyman also noted that
plaintiff "gets symptomatic relief with treatment and medica-
tion, but [this relief] is temporary in nature."  (Tr. 136.)
Clinical findings included impaired sensory, motor and reflex
function in the lower extremity.  (Tr.  136.)  Dr. Hyman also
completed a range of motion chart, noting significant limita-
tions in hip and spinal ranges of motion.  (Tr. 141-41A.)
Plaintiff was also told to avoid "excessive twisting" and cer-
tain other activities that could cause "intense and debilitat-
ing" back spasms and shooting pains that strike "without warn-
ing."  (Tr. 138.)  Dr. Hyman also opined that due to his inju-

---

[6] Motrin (ibuprofen) is indicated for pain and fever.  The maxi-
mum daily dose, unless otherwise directed by a doctor, is 1,200 mg.
See Physicians' Desk Reference 1882 (62nd ed. 2008).  According to Dr.
Hyman's March 1999 statement, plaintiff was taking between 1,600 and
2,400 mg each day.  (Tr. 136.)

ries, plaintiff was limited to lifting and carrying ten to fifteen pounds "not often or for very long," standing and walking for less than two hours daily, and sitting for less than one hour daily. (Tr. 138.)

The record also contains medical evidence from plaintiff's general practitioner, Dr. Hiram Tendler. An October 1993 physical examination report notes an unspecified "lower back problem." (Tr. 307.) Other records indicate that plaintiff had normal blood pressure and blood test results, but took medications for cholesterol and migraine headaches. (See Tr. 307-18.) The earliest discernable mention of a back problem comes from treatment notes dated March 1999, where Dr. Tendler lists plaintiff's current medications and includes Motrin. (Tr. 314.)

Since January 1991, when plaintiff claims to have become disabled, he saw several specialists and the following tests were conducted:

- In March 1995, a magnetic resonance image ("MRI") of the lumbar spine revealed degenerated discs and disc space narrowing at L4-L5 and L5-S1, but "no nerve root compression or thecal sac compression at either level." (Tr. 122.) This evidence contrasts with Dr. Hyman's contemporaneous reports (Tr. 131-32).

- In July 1995, a sonogram found inflammation at L1 through L5 and the sacroiliac joint, "consistent with subluxation," and dislocation of the vertebral joint. (Tr. 123.)

- In March 1996, a similar procedure found inflammation at C3-C6 and T2-T6 with "mild nerve root irritation" at C4-C6. (Tr. 121.)

- In October 1996, shortly after the expiration of plaintiff's insured status, he was examined by an orthopedist who assessed lateral epicondylitis ("Tennis Elbow") and recommended he "learn proper use of his hand and elbow with therapy." (Tr. 154.)

- In January 1997, the same physician during a follow up exam described plaintiff as "much improved. [Despite] some mild crepitation and discomfort . . . [t]herapy has helped a great deal."

- In March 1998, a second MRI of the lumbar spine revealed a disc bulge at L4-L5, a central disc herniation at L5-S1, disc dessication, and loss of disc space height at L4-L5-S1. The exam also showed a degenerative marrow signal at L5-S1. (Tr. 109.)

- In February 1999, an electromyography ("EMG") physician found disc radiculopathy at L4-L5 and L5-S1 and the reviewing physician opined that "[p]atient appears to be quite disabled within his profession, which requires bending, lifting, carrying, and frequent shifts of body position." (Tr. 93.)

At the first administrative hearing in 2001, Dr. Hyman spoke at length about plaintiff's limitations. (See Tr. 183-201.) In particular, Dr. Hyman interpreted the two MRI reports as evidence that plaintiff's condition "got progressively worse from 1995 through 1998 [putting] pressure in the spinal cord." (Tr. 188.) As early as 1991, plaintiff was having difficulty walking and sitting for more than one hour without "numbness or radiating pain down his leg and into his back." (Tr. 191-92.) While plaintiff condition was improved with therapy, Dr. Hyman stated that the improvement was temporary. (Tr. 191.)

At the second administrative hearing in 2006, the ALJ received testimony from Dr. Donald Goldman, an orthopedist who

served as the agency's consulting physician.  Upon reviewing the record, Dr. Goldman noted that the 1995 MRI showed "one or two herniated discs with no evidence of . . . any nerve compromise." (Tr. 393.)  With respect to the 1998 MRI, Dr. Goldman acknowledged that it indicated a herniated disc but found that it did reveal evidence "of any nerve involvement."  (Tr. 384.)  Notably, Dr. Goldman testified that Dr. Hyman's range of motion evaluation was inaccurate and incomplete.  (Tr. 395.)  Dr. Goldman also noted the "significant lapses" in the medical evidence, and stated that without a complete longitudinal treatment record, he was unable to reach a conclusion as to plaintiff's specific limitations.  (Tr. 395-97.)  However, Dr. Goldman did state that based upon the available evidence, he did not think plaintiff was disabled.  (Tr. 402.)

Plaintiff's expert witness, Dr. Johannes Weltin, citing the 1995 MRI and the 1996 sonogram, noted that multiple exams before 1997 indicated significant spinal problems requiring medication. (See Tr. 485-91.)  He also interpreted later testing, including the 1998 MRI and 1999 EMG as showing plaintiff had suffered nerve injury causing pain or dysfunction of the lower extremity. (Tr. 478.)  While these later tests were performed after the expiration of plaintiff's insured status, Dr. Weltin nonetheless inferred that his condition "was worse at an earlier period [because] . . . [w]ith regard to spinal cord disc herniation, gen-

10

erally speaking people tend to improve with time."   (Tr. 479.)
Acknowledging that plaintiff's long-term use of Motrin had
caused serious side effects and that alternative treatments,
such as muscle relaxants, were likely to cause drowsiness and
other work-related problems, Weltin opined that plaintiff was
unable to perform even sedentary work.   (Tr. 501-02.)

**DISCUSSION**

Before addressing the merits of the Commissioner's motion,
we summarize the legal standards applicable to SSDI claims and
review the ALJ's most recent opinion in detail.

## I. Statutory and Regulatory Framework

### A.   Five-Step Analysis

Social Security regulations establish a five-step analysis
to determine whether a claimant is eligible for SSDI benefits.
See 20 C.F.R. § 404.1520(a)(4); see also Berry v. Schweiker, 675
F.2d 464, 467 (2d Cir. 1982)(per curiam).   First, the Commis-
sioner must consider whether the claimant is currently engaged
in substantial gainful activity, defined as work involving "sig-
nificant physical or mental activities . . . [done] for pay or
profit."   20 C.F.R. § 404.1572.   A finding of such activity is a
threshold disqualification for SSDI benefits.   If no such activ-
ity is found, the Commissioner next must consider whether the
claimant has a "severe impairment," which is defined as an im-
pairment that significantly limits his physical or mental abil-

11

ity to perform basic work activities and that is expected to last at least twelve months. If the claimant is so impaired, the third step requires the Commissioner to determine, based solely on the medical evidence, whether the step two impairment meets or equals any of those listed in 20 C.F.R. § 404, Subpt. P, App. 1 ("Appendix 1"). If so, disability is presumed and the claimant is deemed unable to perform any substantial gainful activity. In no such finding is made, the Commissioner must proceed to the fourth step to determine whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work.

Before this determination can be made, the Commissioner must assess the claimant's RFC, which is defined as the most an individual can still do, considering the effects of the physical and mental limitations on his ability to perform work-related tasks.[7] 20 C.F.R. § 404.1545. In undertaking the RFC analysis, the Commissioner may consider "all of the relevant medical and other evidence," including the claimant's daily activities, opinion evidence concerning his limitations, and symptoms such as pain. 20 C.F.R. §§ 404.1512(b), 404.1545(a)(3). The Commissioner may consider the limiting effect of subjective pain only insofar as it can reasonably be accepted as consistent with the

objective evidence. 20 C.F.R. § 404.1529(c)(4). But, state-
ments about pain and other symptoms are not conclusive evidence
of disability unless accompanied by medical evidence indicating
an impairment that could reasonably be expected to produce the
symptoms. 20 C.F.R. § 404.1529(a). In evaluating the credibil-
ity of subjective reports of pain, the ALJ is instructed to take
into account several evaluative factors including daily activi-
ties, medication, treatment and causes of the pain, in order to
determine the extent to which the pain affects the claimant's
functional capabilities. See 20 C.F.R. § 404.1529(c)(3)(i)-
(iv).

At the fourth step, the exertional demands of the claim-
ant's previous work are drawn from his description of that work,
expert testimony of vocational experts, and the Department of
Labor's Dictionary of Occupational Titles.[8] 20 C.F.R.
§ 404.1560(b)(2). If, given his RFC, the claimant is unable to
perform his previous work, the fifth and final step requires the
Commissioner to determine whether there is other work in the na-
tional economy the claimant is able to perform, considering his
limitations and such vocational factors as education, age and

---

[7] Relevant physical capabilities include sitting, standing, walk-
ing, lifting, carrying, handling objects, hearing, speaking and trav-
eling. 20 C.F.R. § 404.1513(c)(1).

[8] U.S. Department of Labor, Dictionary of Occupational Titles
(4th ed. 1991), available at http://www.oalj.dol.gov/libdot.htm.

work experience. This determination ordinarily may be made by resorting to medical vocational guidelines, commonly called "the grids."[9] See Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986); 20 C.F.R. Pt. 404, Subpt. P, App. 2.

## B.  Standard of Review

The scope of judicial review under the Social Security Act is limited to determining whether the Commissioner's final deci-sion is based upon the correct legal standard and is supported by substantial evidence, "keeping in mind that it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."); Lopez v. Barn-hart, No. 05 Civ. 10635 (JSR), 2008 WL 1859563, at *7 (S.D.N.Y. Apr. 23, 2008). The Court may affirm, modify or reverse the Commissioner's decision with or without remanding the cause for a hearing. 42 U.S.C. § 405(g).

## II.  The ALJ's Findings

The ALJ determined at step one that plaintiff had not en-gaged in substantial gainful activity since January 30, 1991,

---

[9] Where a claimant is so incapacitated that he cannot perform "a full range of sedentary work," mechanical application of the grids, which presume such capacity at a minimum, is inappropriate. See Nel-son v. Bowen, 882 F.2d 45, 46 (2d Cir. 1989).

and at step two that he suffered from a severe back impairment. (Tr. 216-17.)  At step three, the ALJ found plaintiff's impairment was neither listed in Appendix 1 nor medically equivalent to any impairment that would automatically qualify him for disability benefits.  (Tr. 217-18); see 20 C.F.R. § 404, Subpt. P, App. 1.

Before proceeding to step four, the ALJ assessed plaintiff's residual functional capacity as required by the five-step process discussed above.  He began by cataloging plaintiff's daily activities including "tending to the needs of [his] 2 children . . . minor housework, neighborhood shopping[,] local driving . . . [and using] a riding tractor to mow his lawn."[10] (Tr. 219.)  From these activities, the ALJ concluded "[plaintiff] was at all times at least capable of engaging in sedentary and 'light' type of work tasks during the years from 1991 through 1996."  (Tr. 219.)

The ALJ then turned to the medical record and raised numerous concerns regarding the source, consistency, and retrospective nature of this evidence.

_____

[10] The ALJ noted parenthetically that in regards to caring for his children "[plaintiff] changed this aspect of his testimony at Hearing II by then claiming (five years later) that he took both his children (even when they were infants!) to a full-time babysitter."  (Tr. 219.) At Hearing I, when asked whether he was "more or less responsible for [his children's] care as a househusband," plaintiff responded, "yes." (Tr. 172.)  At Hearing II, however, plaintiff noted that English was his fifth language and claimed to have been confused by the term. (Tr. 511.)

- First, the ALJ noted that under the Act, chiropractors are not considered "acceptable medical sources" whose medical opinions are accorded the same degree of consideration as those of a licensed physician.[11] (Tr. 222); see 20 C.F.R. §§ 1513(a); Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995). As a chiropractor, Dr. Hyman's finding and medical opinions thus "were not entitled to the same weight as those of a treating physician" under Social Security regulations. (Tr. 222.)

- Second, even if this were not the case, the ALJ also noted several inconsistencies in Dr. Hyman's testimony and medical reports. In particular, the doctor's early records indicated that plaintiff "was working," "not disabled," and "expected to respond well to therapy." (Tr. 220.) Only in 1993 did Dr. Hyman opine that that plaintiff was disabled, an opinion that would change again in 1995. (Tr. 220, citing 129.) While the 1995 objective MRI report specifically found "no nerve root compression or thecal sac compression," Dr. Hyman's 1995 subjective examination reports specifically found "nerve root compression." (Tr. 220-21, citing 122, 130.) From this contradiction, the ALJ concluded "this report . . . was in error. That Dr. Hyman's opinion was based on a faulty assumption makes his opinions during the initial period less convincing." (Tr. 221.)

- Third, the ALJ found it remarkable that in Dr. Tendler's records, which spanned eight years of treatment, there had been no mention of a "significant back impairment." (Tr. 221, citing Tr. 306-60.) On several occasions between 1994 and 1999, the doctor even noted that plaintiff "feels well." (Tr. 221, citing Tr. 309, 311, 313-14.) The ALJ also questioned Dr. Tendler's reliance on a number of post-1996 diagnostic tests in order to reach a conclusion concerning plaintiff's condition at an earlier time. While the 1998

---

[11] Acceptable medical sources are limited to licensed physicians, psychologists, optometrists, podiatrists, and speech language pathologists. 20 C.F.R. §§ 1513(a)(1)-(5). Evidence from other medical sources, including chiropractors, may be used to show the severity of impairment, but may not be relied upon to establish a medically determinable impairment. 20 C.F.R. §§ 1513(d).

MRI and 1999 EMG studies indicated a number of serious spinal problems, "[s]uch information does not . . . take into account changes . . . in the claimant's medical condition that may have occurred subsequent to his date last insured." (Tr. 221, citing Tr. 91, 109.)

- Finally, the ALJ also questioned several physicians' use of medical evidence obtained after plaintiff's insured status had expired to determine whether he was disabled during the relevant period. In particular, Dr. Weltin relied upon Dr. Hyman's 1999 range of motion measurements to opine that plaintiff was disabled as early as 1991. (Tr. 222.) The ALJ also noted that Dr. Weltin's medical opinion appeared to be "significantly based" on Dr. Hyman's other post-1996 reports, including the "mistaken belief" that objective testing prior to 1996 had revealed nerve root compression. (Tr. 222.)

Thus, citing Dr. Hyman's contradictory assessments, Dr. Weltin's "over-reliance on [Dr. Hyman's] chiropractic findings," and the absence of any indication of a serious back problem from Dr. Tendler's treatment notes, the ALJ ultimately gave greater weight to Dr. Goldman's opinion, finding it "more reasonable with the facts and circumstances of [the] case.". (Tr. 223-24.) In addition, the ALJ concluded that plaintiff's statements of disabling symptoms and limitations were "out of proportion" and "not fully consistent with the record when considered in its entirety." (Tr. 224.) Considering the objective medical evidence and plaintiff's daily activities, the ALJ found that plaintiff was capable of performing "sedentary" types of activities and that his impairments were not of such severity or intensity so as to preclude all work activities. (Tr. 224.)

The ALJ then proceeded to step four to determine whether plaintiff was able to return to his past relevant employment as an electrician despite being functionally limited to sedentary work.   Noting that the job "was performed at the light exertional level," the ALJ concluded plaintiff was unable to perform his past relevant work.   (Tr. 224.)   At step five, however, the ALJ resorted to the Grids to determine that, despite his functional limitations, plaintiff could perform other work in the national economy given his age, education, and skill set.   (Tr. 225, citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.22.) From this entire assessment, the ALJ concluded that plaintiff was not disabled before the expiration of his SSDI insurance status on September 30, 1996.   (Tr. 225.)

### III. Review of the ALJ's Findings

In opposing the Commissioner's motion, plaintiff challenges the ALJ's step five determination that he was able to perform work available in the national economy and the RFC analysis underlying this conclusion.   His argument has three prongs: (1) that the ALJ failed to properly develop the record by obtaining his complete medical history; (2) that the ALJ arbitrarily disregarded portions of the medical record relevant to his disability or, in the alternative, the ALJ improperly relied upon the opinion of the agency's consulting physician; and (3) that the

ALJ did not properly credit his subjective reports of pain. We address each claim seriatim.

### A.  Completeness of Record

Plaintiff contends that the ALJ failed to fulfill his duty to develop a complete medical history because the Workers' Compensation Board failed to respond to a subpoena "and no effort was made by the ALJ to enforce it."[12]    (Pl. Mem. 5.)   While the Board's failure to respond to multiple subpoenas is troubling, we cannot say that the record was incomplete.

Under the five-step disability analysis, a claimant is responsible for providing medical evidence that demonstrates his impairment, its severity, and the attendant functional limitations.    20 C.F.R. § 404.1512(c).   The Commissioner, for his part, must make every reasonable effort to develop the claimant's complete medical history before determining whether he is disabled under the Act.    20 C.F.R. § 404.1512(d).   A "complete medical history" includes all records of the plaintiff's medical sources covering at least the twelve months preceding the expiration of insured status.    20 C.F.R. § 404.1512(d)(2).

---

[12] Plaintiff also notes he was refused treatment by several doctors and that some records were destroyed by a natural disaster while in his doctor's possession.  (Pl. Mem. 4-5.)  If true, both circumstances are irrelevant to the ALJ's obligation to complete the record. It is unreasonable to expect the ALJ to gather medical evidence that never existed or was lost.

The ALJ satisfied his duty here.  The extensive record in this case contains evidence from the entire relevant period, and beyond.  See Thomas v. Barnhart, No. 01 Civ. 581 (GEL), 2002 WL 31433606, at *5 (S.D.N.Y. Oct. 30, 2002) (holding that in a Social Security case, the administrative record is complete where it contains "extensive information on [claimant's] medical conditions covering the full period in dispute").  It contains more than one hundred pages of treatment notes from these doctors taken during the relevant period.  (Tr. 91-101, 107-43, 154, 306-80, 382-83.)  Also included are nine of Dr. Hyman's reports to the Workers' Compensation Board between 1991 and 1997, (Tr. 125-27, 129-34), his 1999 range of motion study (Tr. 141-41A), the results of the 1995 and 1998 MRIs (Tr. 109, 122), as well as the 1995 and 1996 sonograms (Tr. 121, 123).  The ALJ also received testimony from Dr. Hyman (Tr. 183-201), Dr. Weltin, plaintiff's medical expert (Tr. 473-502), and Dr. Mandelbaum, his medical representative (Tr. 503-10).  The record also contains the medical opinion of Dr. Goldman, the agency's expert witness (Tr. 391-411).  It is simply not the case that the ALJ reached his conclusion on an incomplete record.

In addition, multiple attempts were made to obtain medical records from plaintiff's several physicians.  The ALJ issued subpoenas to the Workers' Compensation Board on January 19, 2001, three months before the first administrative decision, and

on October 24, 2005, eight months before the second administra-
tive decision. (Tr. 147-49, 294-95.) While the Board failed to
respond to either, it is not the case, as plaintiff suggests,
that the ALJ has a statutory duty to take "any necessary action
to develop the record [including] . . . [e]nforcement of sub-
poenas." (Pl. Mem. 5 n.1.) The use of subpoenas in social se-
curity proceedings is governed primarily by 20 C.F.R.
§ 416.1450(d), which provides, in pertinent part:

> When it is reasonably necessary for the
> full presentation of a case, an admin-
> istrative law judge [may] issue subpoe-
> nas for the appearance and testimony of
> witnesses and for the production of
> books, records, correspondence, papers,
> or other documents that are material to
> an issue at a hearing.

"The plain language of this section clearly places the decision
to issue a subpoena within the sound discretion of the ALJ."
Serrano v. Barnhart, 02 Civ. 6372 (LAP), 2005 WL 3018256, at *3-
4 (S.D.N.Y. Nov. 10, 2005). Accordingly, the Second Circuit has
determined that an ALJ's decision to enforce a subpoena on an
unresponsive party is discretionary. Yancey v. Apfel, 145 F.3d
106, 113 (2d Cir. 1998)("[T]o accept, as a matter of law, that a
disability claimant has an absolute right to subpoena a report-
ing physician would unnecessarily increase the financial and ad-
ministrative burdens of processing disability claims while di-
luting the ALJ's discretion in how he develops the record.").

Thus, because the right to due process in a social security dis-
ability hearing does not include unfettered use of the subpoena
power, id. at 111, we refuse to overturn the ALJ's decision
based upon plaintiff's first argument.

### B.   Credibility of Evidence

#### 1.   ALJ's Evaluation of Medical Opinion Evidence

Plaintiff second argument is that the ALJ was obligated, as
a matter of law, to consider as relevant "any medical evidence
indicative of plaintiff's physical condition during the perti-
nent period." (Pl. Mem 3.)  He thus believes the ALJ should
have relied more heavily, if not exclusively, on the testimony
of his expert, Dr. Weltin.  In a similar vein, plaintiff con-
tends the ALJ should have discounted Dr. Goldman's testimony be-
cause of his alleged conflict of interest as an agency expert
witness.  These claims are without merit.

#### (a)   Dr. Weltin

While an ALJ has a duty to consider "all evidence in [the]
case record" when making a disability determination, 20 C.F.R.
§ 404.1520(a)(3), there is no question that the ALJ retains dis-
cretion in deciding how to weigh medical opinions.   20 C.F.R.
§ 404.1527(d).  Under the treating physician's rule, only if the
ALJ finds that a treating source's opinion is "well-supported by
medically acceptable clinical and laboratory diagnostic tech-
niques and is not inconsistent with the other substantial evi-

22

dence in [the] case record," is the ALJ obliged to give it con-
trolling weight.    20 C.F.R. § 404.1527(d)(2).    Otherwise, the
ALJ considers additional factors such as the examining relation-
ship, the physician's specialization, evidence presented to sup-
port the opinion and its consistency with other evidence in the
record.    20 C.F.R. §§ 404.1527(d)(1)-(6); Klett v. Barnhart, 303
F. Supp. 2d 477, 484 (S.D.N.Y. 2004) (citing Shaw v. Chater, 221
F.3d 126, 134 (2d Cir. 2000)).

    Plaintiff argues that the ALJ's determination that he could
perform sedentary work was incorrect because the ALJ should have
accepted Dr. Weltin's opinion, which plaintiff asserts "appeared
to be more than sufficient to establish his disability."    (Tr.
5.)    However, Dr. Weltin is not plaintiff's treating physician
and thus his opinion is not automatically entitled to control-
ling weight.    The ALJ therefore must, as he did and in exercis-
ing his discretion, weigh all of the opinion evidence in the re-
cord.    In doing so, the ALJ specifically considered and ex-
plained his reasons for rejecting Dr. Weltin's opinion.

    First, the doctor's opinion rested heavily on medical evi-
dence gathered after plaintiff's insured status expired in 1996,
including a 1999 EMG and physical examination.    (Tr. 222; see
Tr. 476-78.)    Dr. Weltin also appeared to be "significantly in-
fluenced" by Dr. Hyman's range of motion study conducted in
March 1999.    (Tr. 222; see Tr. 135, 485.)    Although the ALJ

23

found the results of these tests "instructive to a total under-
standing of [plaintiff's] medical situation," they were of lim-
ited use "and cannot[] take into account changes . . . in
[plaintiff's] medical condition that may have occurred subse-
quent to the last date on which he was insured. (Tr. 221.)
Further, the ALJ deemed the results of these tests to be incon-
sistent with earlier testing, which were conducted before plain-
tiff's insured status expired and which showed that his condi-
tion was less serious. (Tr. 222; see Tr. 121-23, 154.)

Second, the ALJ criticized Dr. Weltin's reliance on the
testimony and pre-1997 records of Dr. Hyman who, as a chiroprac-
tor, is not considered an "acceptable medical source" under the
Act and whose medical opinions are not accorded the same eviden-
tiary weight as those of a licensed physician. 20 C.F.R.
§§ 1513(a); see Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir.
1995).

Finally, the ALJ questioned Dr. Weltin's conclusions be-
cause of inconsistencies in the evidence used to support them.
These included Dr. Hyman's early opinion that plaintiff "should
respond well" to therapy (Tr. 124.), his reports to the Worker's
Compensation Board alternately indicating that plaintiff was or
was not disabled (Tr. 125-27, 129-34), and his opinion that
plaintiff's condition was manageable "with medication and regu-
lar therapy" (Tr. 219-20). Dr. Weltin's analysis also rested

squarely upon Dr. Hyman's repeated diagnoses between 1991 and 1995 of "lumbar nerve root compression," which was directly contradicted by contemporaneous MRI evidence showing "no nerve root compression." (Tr. 122, 125-28, 130-32.)

In sum, there were substantial reasons to justify the weight the ALJ gave to the opinions of plaintiff's expert witness.

### (b) Evidence Disfavoring Plaintiff

The ALJ also has good reason to rely on Dr. Goldman's testimony. The opinions of consulting experts are permitted under the Act, 20 C.F.R. § 1527(f)(2)(iii), and are a commonly used tool to assist administrative law judges in determining the nature and severity of a claimant's impairments. See Richardson v. Perales, 402 U.S. 389, 408 (1971) ("The trial examiner is a layman; the medical adviser is a board-certified specialist. He is used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner. He is a neutral adviser."). During his testimony, Dr. Goldman observed that the medical evidence before 1997 did not show nerve root damage or "any nerve involvement." (Tr. 393.) Dr. Goldman also noted that the record did not contain any evidence of spasm, atrophy or weakness in the lower extremities, which would be consistent with nerve damage. (Tr. 398.) Ultimately, the ALJ considered Dr. Goldman's characterization of the medical

evidence as more persuasive and more consistent with a record that showed only a "small disc herniations prior to October 1996 but (i) no nerve root compression, (ii) no thecal sac compression, (iii) no foraminial stenoisis and (iv) no spinal stenosis." (Tr. 223-24.) Given the medical evidence in the record and the problems with Dr. Weltin's medical opinion, the ALJ properly exercised his discretion in weighing the relative strength of the opinion evidence.

Plaintiff's assertions that the ALJ should have ignored the analysis of Dr. Goldman because he was biased and because he testified by speakerphone are without merit. Plaintiff offers no reason to believe Dr. Goldman was biased and there is simply no evidence to support that contention. With respect to the Dr. Goldman's appearance by phone, courts have repeatedly found that certain rules of ordinary legal proceedings do not apply because Social Security proceedings are non-adversarial in nature. See, e.g., Sims v. Apfel, 530 U.S. 103, 107 (2000); Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). We also note that Dr. Goldman was cross-examined by plaintiff's representative and there is no indication that the cross-examination was impeded by Dr. Goldman's location. We therefore reject plaintiff's due process arguments.

### 2. Substantial Evidence Supports ALJ's Step Five Determination

Based upon the foregoing, the record supports the ALJ's conclusion that plaintiff could perform sedentary work before the expiration of his insured status. To review: In 1991, Dr. Hyman reported that plaintiff was not disabled. (Tr. 125-27.) Dr. Hyman also testified that plaintiff's condition was manageable with continued treatment and medication. (Tr. 219-20.) Dr. Tendler's treatment records note on several occasions between 1994 and 1999 that plaintiff "feels well." (Tr. 309, 311, 313-14.) While a 1995 MRI showed small disc herniations, there was no evidence of any nerve root compression. (Tr. 122.) After a follow up visit to his orthopedist in January 1997, Dr. Katz noted that plaintiff's shoulder and elbow pain were "much improved." (Tr. 154.)

### C. Subjective Reports of Pain

Plaintiff final contention is that the ALJ improperly discounted his subjective reports of pain based upon his daily activities and other evidence in the record. (Pl. Mem. 15-16.) This argument also fails.

While it is true that subjective reports of pain supported by objective medical evidence must be considered, see Simmons v. U.S. R.R. Retirement Bd., 982 F.2d 49, 52 (2d Cir. 1992), the ALJ has broad discretion to "arrive at an independent judgment,

in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); see also Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983). In making this credibility determination, the ALJ is to account for several evaluative factors, including daily activities, medication, treatment, and causes of the pain, in order to determine the extent to which the pain affects the claimant's functional capabilities. See 20 C.F.R. § 404.1529(c)(3)(i)-(iv); Morganstein v. Chater, 111 F.3d 123 (2d Cir. 1997); Miller v. Astrue, 538 F. Supp. 2d 641, 652-53 (S.D.N.Y. 2008). While a plaintiff's description of his daily activities is insufficient to discredit his subjective statements, see Polidoro v. Apfel, No. 98 Civ. 2071 (RPP), 1999 WL 203350, at *8 (S.D.N.Y. Apr. 12, 1999), they must be considered in light of the entire record. See Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999); Hill v. Barnhart, 410 F. Supp. 2d 195, 207 (S.D.N.Y. 2006). In the end, the ALJ's evaluation of the credibility of plaintiff's subjective reports of pain is entitled to substantial deference by this Court. See Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984).

In his SSDI application, plaintiff alleged disability due to "low back pain and leg pain" caused by a work-related accident. (Tr. 73-82.) This pain made him unable to sit upright for more than forty-five minutes without "pressure on [his]

back." (Tr. 175.) Plaintiff also testified to using prescription strength Motrin for 20 years to control his pain, but that his pain was more or less constant and "not fully relieved by the medication."[13] (Tr. 172, 175-77.)

Plaintiff's daily activities included shopping and cooking "once in a while," performing "some household . . . chores," light house repair work, and cutting his lawn with a riding mower. (Tr. 177.) It was entirely appropriate for the ALJ to consider these routine activities in assessing plaintiff's credibility and capacity to perform work-related activities. See 20 C.F.R. § 404.1529(c)(3)(i). As such, we cannot find fault with the ALJ's observations that plaintiff's subjective description of his symptoms and limitations were "out of proportion[,] . . . not fully supported by the objective medical evidence[,] and . . . not fully consistent with the record when considered in its entirety." (Tr. 224.)

In sum, the ALJ's conclusion that plaintiff was capable of engaging in at least sedentary work prior to the expiration of his insured status and that he was therefore capable of performing other work available in the national economy is supported by substantial evidence.

---

[13] Despite plaintiff's long-term use of this prescription medication, the only objective evidence in the record is a photocopy of a prescription label dated July 19, 2000. See Tr. 157.

## **CONCLUSION**

We find that substantial evidence in the record supports the ALJ's determination that plaintiff was not disabled before the expiration of his insured status and accordingly, because the Commissioner did not apply an erroneous legal standard, defendant's motion for judgment on the pleadings is granted and the case is closed.

**IT IS SO ORDERED.**

Dated:    New York, New York
         August 19, 2008


NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**<u>Plaintiff Pro Se</u>**
Lazslo Friedman
124 Forshay Road
Monsey, NY 10952-1019

**<u>Counsel for Defendant</u>**
Susan D. Baird
United States Attorney's Office
86 Chambers Street, 3rd Floor
New York, NY 10007-2632